**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**
**3:08-cv-219-RJC**
**(3:04-cr-223-RJC-DCK-2)**

| | |
|---|---|
| **MADISON DUANE MCRAE,** | ) |
| | ) |
| **Petitioner,** | ) |
| | ) |
| **vs.** | ) |
| | )       **ORDER** |
| | ) |
| **UNITED STATES OF AMERICA,** | ) |
| | ) |
| **Respondent.** | ) |
| ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾ | ) |

**THIS MATTER** comes before the Court on remand from the Fourth Circuit Court of Appeals following the reversal of this Court's dismissal of Petitioner's Motion for Relief from Judgment as a successive petition. Also pending before the Court are the following pro se motions filed by Petitioner: (1) Motion for Sanctions Pursuant to FED. R. CIV. P. 11(b), (Doc. No. 56); (2) Motion Hazel-Atlas Bill of Review, (Doc. No. 57); (3) Motion for Recusal, (Doc. No. 58); and (4) Motion for Disqualification/Recusal, (Doc. No. 67). Petitioner is represented by William Durbin and Breana Jeter.

Petitioner Madison Duane McRae seeks relief from this Court's judgment denying his motion to vacate his conviction for drug-trafficking offenses under Federal Rule of Civil Procedure 60(b). Because Petitioner's Rule 60(b) motion is untimely and because he has not identified any errors of this Court in the denial of his motion to vacate that warrant the extraordinary relief he requests, Petitioner's Rule 60(b) motion is denied. Furthermore, the Court will deny Petitioner's remaining motions that were filed pro se.

## I.       BACKGROUND

1

1. Using female companions to transport cocaine and crack cocaine on or in their bodies, Petitioner imports controlled substances from Jamaica.

In 2004, Agent Blaine Crum with Immigration and Customs Enforcement ("ICE") began investigating Petitioner and his co-defendant, Rodney Green, after noticing that Green was traveling frequently to Jamaica on high-dollar tickets through the Memphis airport, a lifestyle that could not be supported by the job he had or the information he was reporting to customs inspectors. (Crim. Case No. 3:04-cr-223-RJC-DCK-2, Trial Tr. at 94; 97-98). As a result of his investigation into Green's recent history, Agent Crum learned that $18,000 in cash had been seized from Green in Miami and that 266 grams of cocaine had been seized from Cheryl Turner, an associate of Green's, when she and Andrea Spears, another associate of Green's, came through Atlanta. (Id. at 98).

As the investigation continued, Agent Crum learned on August 21, 2004, that Green, Spears, and Petitioner had all traveled to Jamaica, with Petitioner and Green traveling through the same airports and Spears and two other women, Latia Harris and Atonia Bailey, traveling together on a different itinerary, notwithstanding the fact that all of the tickets were paid for in cash and purchased at the Columbus, Ohio airport. (Id. at 101; 119-23). Agent Crum also learned that Petitioner and Meonia Johnson paid cash to travel to Jamaica earlier in the month, buying the tickets at the Columbus airport two days before departure and staying in Jamaica only two days. (Id. at 130-35).

Learning that Spears, Harris, and Bailey would be traveling back through the Charlotte airport, Agent Crum arranged for the women to be questioned by customs agents, who ultimately seized powder and crack cocaine from Bailey and cocaine and marijuana from Harris. (Id. at 177; 180; 215; 249; 272-73). Agent Crum then arranged for customs agents to conduct a

"secondary examination" of Petitioner and Green, during which a customs inspector pulls aside a traveler entering the United States to examine more closely his customs declaration and travel documents.  (<u>Id.</u> at 102-03).

After Agent Crum spoke with both Petitioner and Green during their secondary examinations, he learned from the customs agents in Charlotte that Harris and Bailey had been found to have been transporting controlled substances and that Bailey identified Petitioner, and Petitioner and Green were placed under arrest.  (<u>Id.</u> at 107; 182-83).  Agent Crum seized Petitioner's cell phone incident to his arrest and later obtained a search warrant for the information contained in the cell phone, retrieving all of the numbers in Petitioner's list of contacts, a record of all recent telephone calls, and all text messages on the phone.  (<u>Id.</u> at 108-09; 111).  Agent Crum learned that Bailey's number was the number under the contact on Petitioner's phone identified as "Tnia" and that Petitioner and Green had contacted each other by cell phone the day before they were to leave for Jamaica.  (<u>Id.</u> at 108-09; 112-13).

2. Petitioner is tried by a jury and convicted of four drug-trafficking offenses.

Petitioner was ultimately indicted by a federal grand jury and charged with conspiracy to possess with the intent to distribute more than five kilograms of cocaine, in violation of 21 U.S.C. § 846; possession with the intent to distribute more than 1.5 kilograms of cocaine and aiding and abetting that possession, in violation of 21 U.S.C. § 841 and 18 U.S.C. § 2; conspiracy to import cocaine, in violation of 21 U.S.C. §§ 963 and 952(a); and importing cocaine and aiding and abetting that importation, in violation of 21 U.S.C. §§ 952(a) and 960 and 18 U.S.C. § 2.  (Crim. Case No. 3:04cr223-RJC-DCK-2, Doc. No. 56).  Petitioner's case was tried before a jury, beginning September 12, 2005.

a. Co-Conspirator Testimony.

During Petitioner's trial, Green, Bailey, Harris, and Spears testified against him. Green testified that he began distributing cocaine to Petitioner in 2003 and that he later agreed to help Petitioner import cocaine from Jamaica. (Crim. Case No. 3:04-cr-223-RJC-DCK-2, Trial Tr. at 374-77). According to Green, he, Petitioner, and a female companion traveled to Jamaica between August 4 and August 7, 2004, where Green, using Petitioner's money, bought a kilogram of cocaine and instructed Petitioner as to how to strap it onto the female in order to get it into the United States. (Id. at 378-80). Green testified that, after that trip, Petitioner wanted to return to Jamaica, and Green arranged for Spears and Harris to go, while Petitioner arranged for Bailey to travel with the group. (Id. at 382-84). Petitioner bought all of the tickets, and Green bought 1.5 kilograms of cocaine on Petitioner's behalf while in Jamaica. (Id. at 383-91). Green testified that he provided Petitioner with Ace bandages and duct tape to use in strapping the cocaine onto Bailey and that Harris and Spears assisted in transporting Petitioner's cocaine because Bailey could not transport that quantity alone. (Id. at 394; 397).

Bailey testified that Petitioner approached her in mid-August 2004 and asked her to go to Jamaica to "bring something back" in exchange for $500. (Id. at 159). Although Bailey initially agreed, she later changed her mind but agreed to go to Jamaica after Petitioner told her that he would not be able to meet his "connect" and that, because he had already bought their tickets, they could still go to Jamaica and "kick it." (Id. at 160-61). Bailey testified that on the morning they were scheduled to return to the United States, she got out of the shower to find that her ticket and birth certificate were gone. (Id. at 169). Petitioner told Bailey that if she wanted to get home, she would have to transport packages and then instructed Bailey to wear a skirt he had bought for her in Jamaica. (Id. at 170-71). Petitioner wrapped a package on each leg in Ace bandages and duct tape and gave Bailey a third package to wear as a pad in her panties. (Id. at

170-71; 174-75).

Harris testified that she went to Jamaica at Green's invitation and that, when she got out of the shower on the morning the group was to depart, there was a package lying next to her clothes. (Id. at 261-62; 269-70). Green instructed her to insert the package into her vagina, which she did, id. at 269-70. According to Harris, Spears also inserted a package into her vagina, while Bailey had packages taped onto the insides of her thighs, id. at 270. Spears testified that she had accompanied Green and a female companion named Cheryl Turner to Jamaica in January 2004 and that, while Spears successfully transported 500 Ecstasy pills in her vagina into the United States, Turner was caught and she and Green were detained and later released. (Id. at 318-20). Spears testified that she was asked to go to Jamaica again in the summer of 2004, but she declined, until Green assured her that it was not "going to be a trip like the first trip." (Id. at 323). On the morning they were to return to the United States, Spears got out of the shower and found a package with drugs in them lying on her clothes. (Id. at 334). According to Spears, she "immediately got furious" but ultimately decided not to argue. (Id. at 334-35). Nevertheless, after initially inserting the package into her vagina, she removed it and put it in between the mattress and the box spring, and she was not found with drugs upon her re-entry into the United States. (Id. at 335).

b. This Court permits agents to testify to Petitioner's post-arrest statements.

In addition to the testimony of Petitioner's co-conspirators, the Government also presented the testimony of several law enforcement agents during Petitioner's trial. Agent Crum testified that, during his interview of Petitioner as part of the secondary inspection, Petitioner told Agent Crum that he was in real estate and that Green had paid for his trip to Jamaica. (Id. at 105-07). During the interview, Agent Crum asked Petitioner if he could look through

Petitioner's cell phone, and, after Petitioner consented, Agent Crum did so, noticing that one of his contacts was "Tnia."  (Id. at 107; 141-42).  Agent Crum asked Petitioner if that contact was for Atonia Bailey, but Petitioner responded that it was not.  (Id. at 107-08).  At some point, Petitioner told Agent Crum that he did not want Agent Crum looking through his cell phone, and Agent Crum did not go through it again until he got a search warrant.  (Id. at 141-42).

As Agent Crum began testifying to his interview of Green and Petitioner at the Memphis airport, Petitioner's trial counsel objected, explaining to this Court that Agent Crum would be testifying to statements made by Petitioner and that Petitioner's "contention" was that "he never made those statements at all."  (Id. at 103-04).  Trial counsel asserted that there was no corroborative evidence that the statements were made and no waiver-of-rights form and that he wanted to conduct a voir dire of Agent Crum.  (Id. at 104).  In response, this Court stated that it "[s]ound[ed] to [the court] that all of [Petitioner's] objections to testimony [were] the kind of things that [counsel] would be able to do on cross," noting that whether the statements "were made or not is something that is the subject of cross-examination and not subject to the necessity of a voir dire examination."  (Id.).  Government counsel then noted that there had been no motion to suppress filed, and Petitioner's counsel agreed, stating that he was making the motion at trial to voir dire the agent about the statements.  (Id. at 104-05).

The Government also presented the testimony of Agent Robert Mensinger, an ICE agent who assisted Agent Crum in his investigation of Petitioner and Green upon their arrival in Memphis.  (Id. at 544-45).  As during Agent Crum's testimony, Petitioner objected to the admission of Agent Mensinger's testimony about his conversation with Petitioner in a locked examination room, requesting the opportunity to voir dire Agent Mensinger and explaining that Petitioner's "contention" was that the statements to which Agent Mensinger would testify "were

never made." (Id. at 546-47). Petitioner's counsel stated that he also sought to voir dire Agent Mensinger about these statements to "get to the bottom of . . . whether or not any of [Petitioner's] rights were violated," noting that "he was probably being detained . . . , but he was not given his Miranda rights." (Id. at 547). This Court asked whether Petitioner had filed a motion to suppress, and counsel replied that he did not "because the suppression motion would have been difficult to draft in the sense that [his] client [said] he never made the comments in the first place." (Id. at 547-48). The Court then denied Petitioner's request to voir dire Agent Mensinger but instructed government counsel to "lay a foundation that includes sufficient information for the Court to determine whether there's any . . . violation of rights." (Id. at 548).

Agent Mensinger testified that after Petitioner's flight began unloading, he spoke briefly with Agent Crum and later went into a locked examination room where Petitioner was waiting to check on him, not intending to interview him. (Id. at 546; 557). Petitioner, however, asked Agent Mensinger if he was in charge, and when Agent Mensinger responded that he was the resident agent in charge, Petitioner asked him "what type of trouble he was in." (Id. at 546). According to Agent Mensinger, he replied that Petitioner was under arrest and would be brought to a federal magistrate the following day for a bond hearing. (Id. at 548). Petitioner then asked if he could help himself, prompting Agent Mensinger to ask whether he had been advised of his rights. (Id. at 549). Petitioner replied, "Yeah, I know my rights." (Id.). Although Agent Mensinger did not "run down for him what [he] knew to be the standard Miranda rights," he advised Petitioner of his right to be silent, his right not to speak without an attorney, his right to have an attorney appointed down the road, and his right to remain silent and decline to cooperate. (Id. at 554).

Agent Mensinger explained to Petitioner that any cooperation he provided would be

brought to the attention of the federal prosecutor and may be relayed to the federal magistrate, who would determine whether he should be detained or released.  (Id. at 549).  Agent Mensinger also told Petitioner that "he was under no obligation to speak with agents at all without an attorney present."  (Id.).  When asked whether he told Petitioner that an attorney would be given to him if he wanted one, Agent Mensinger replied, "Yes."  (Id.).  Agent Mensinger testified that he then impressed upon Petitioner the importance of telling the truth, suggesting that if he was going to lie or tell half-truths, he would be "better off just remaining silent and getting an attorney later on in the process" and advising him that "the cooperation door" would "still be open down the road," such that he could cooperate and try to help himself after he had an attorney.  (Id. at 549-50).  Agent Mensinger testified that he explained to Petitioner that, if he sought to cooperate, he would get Agent Crum, because he was the investigating agent.  (Id. at 549).

Petitioner told Agent Mensinger that he did not know anything and that he did not do anything wrong, and Agent Mensinger advised him "to just remain silent, get with your attorney, and . . . talk about this down the road."  (Id. at 550).  As Agent Mensinger began to leave the interview room, Petitioner asked if he could see a photo of one of the girls who were "putting the blame on him."  (Id.).  Agent Mensinger said that he could not and began leaving the room, when Petitioner stated that he was "upset, very upset that the girls were putting all the blame on him and not [Green]."  (Id.).  Agent Mensinger walked back into the room, and Petitioner began talking about Jamaica, including where they stayed, their travel to and from, and the cocaine. (Id. at 551).  Petitioner stated initially that he had not seen Bailey for weeks and that he did not hang out with any American women in Jamaica, id., but later changed his story, admitting to being in Jamaica with Bailey, Harris, Spears, and Green and to having seen the cocaine but

insisting that Green was responsible for the cocaine and for strapping cocaine onto "the girls'" legs, id. at 551-53.

Following the Court's instructions to the jury and immediately after the jury began its deliberations, this Court further explained its decision to deny Petitioner the right to voir dire Agent Mensinger. (Id. at 632). The Court explained that Petitioner had waived the right to a suppression hearing by failing to file a pretrial motion to suppress. (Id.). The Court then stated, "alternatively, as well," that it had listened to the testimony about any statements made by Petitioner and found the agent's testimony to be credible, that appropriate warnings were given, and that any statements made by Petitioner were knowing and voluntary. (Id.). The Court stated that it had permitted evidence of Petitioner's statements "after what [the Court] believe[d] to be a proper foundation had been laid." (Id. at 633).

At the conclusion of the trial, the jury found Petitioner guilty of all counts. (Id. at 636). Based on a total offense level of 37 and a criminal history category of I, this Court calculated an advisory Sentencing Guidelines range of imprisonment of between 210 and 262 months and sentenced Petitioner to 210 months in prison, entering its judgment on June 20, 2006.[1] (Crim. Case No. 3:04-cr-223-RJC-DCK-2, Doc. No. 189). Petitioner appealed, and the Fourth Circuit affirmed this Court's judgment on May 30, 2007. United States v. McRae, 235 F. App'x 968 (4th Cir. 2007).

3. Petitioner files a § 2255 motion to vacate, which this Court denies.

A year after this Court affirmed his conviction and sentence, Petitioner filed a motion to

---

[1] On December 9, 2015, this Court further reduced Petitioner's sentence to 168 months' imprisonment pursuant to Guidelines Amendment 782. (Crim. Case No. 3:04-cr-223-RJC-DCK-2, Doc. No. 243). The Federal Bureau of Prisons website indicates that Petitioner's projected release date is April 5, 2017.

vacate under 28 U.S.C. § 2255, asserting 22 claims of error.   (Case No. 3:08cv219, Doc. No. 1).

Pertinent to the issues here, Petitioner argued that trial counsel improperly failed to move to

suppress evidence gathered as a result of the illegal seizure and search of his cell phone, id. at 6,

and that trial counsel improperly failed to file a motion to suppress Petitioner's statements based

on their having been obtained in violation of the Fifth Amendment, id. at 8.  With respect to trial

counsel's failure to move to suppress Petitioner's statements, Petitioner asserted that he asked

counsel to file a motion to suppress but counsel failed to do so and that this Court denied

Petitioner's objection to the admission of those statements at trial, stating that Petitioner had

waived his right to seek their suppression by not filing a pretrial motion to suppress.  (Id. at 8;

17).  In arguing that appellate counsel failed to raise the same Fifth Amendment violation,

Petitioner stated that "[t]rial testimony shows that movant was interrogated by Agent Crum

without being read his Miranda warnings."  (Id. at 17).

This Court ordered the Government to file a response to Petitioner's motion to vacate,

and the Government did so, moving for summary judgment as to each of Petitioner's claims.  A

month after the Government filed its response, Petitioner filed a lengthy memorandum

supporting his motion, asserting for the first time many of the facts in support of his motion.

This Court then ordered the Government to file a supplemental response addressing the

arguments made in Petitioner's memorandum, and the Government did so, asserting, in part and

mistakenly, that in overruling Petitioner's objection to the admission of his out-of-court

statements at trial, this Court had not mentioned Petitioner's failure to file a pretrial motion to

suppress those statements.

On March 15, 2011, this Court denied Petitioner's motion to vacate.   (Case No.

3:08cv219, Doc. No. 39).  In holding that Petitioner had not produced evidence creating a

10

genuine issue of material fact as to his claim that trial counsel provided constitutionally deficient representation in failing to move, pretrial, to suppress his statements, the Court noted that trial counsel objected to the admission of those statements on the basis that Petitioner never made the statements and that, while government counsel noted that Petitioner had not filed a motion to suppress the statements, this Court had not mentioned the absence of a pretrial motion to suppress, apparently adopting the Government's mistaken assertion.  (Id. at 8).

Addressing the merits of the suppression issue, this Court noted that Agent Crum testified that he spoke with Petitioner during an interview upon Petitioner's return into the United States and during the customs re-entry process.  (Id. at 9).  The Court also stated that Agent Crum had testified that before he spoke with Petitioner, Petitioner had insisted that he was aware of his rights.  (Id.).  The Court also noted that Agent Mensinger explained to Petitioner that he did not have to answer any questions, that a lawyer would be appointed to represent him if he could not retain one, and that he should not answer any questions if he could not answer them truthfully.  (Id.).  The Court concluded that, even if Petitioner was not administered his formal Miranda warnings, he "was at least informed of some of his rights consistent with Miranda warnings."  (Id.); see also Miranda v. Arizona, 384 U.S. 436, 478-79 (1966).

The Court then held, alternatively, that even if trial counsel was ineffective in failing to file a motion to suppress his statements, Petitioner had not established that he was prejudiced by the admission of his statements at trial.  (Id. at 9).  The Court noted that Agent Mensinger testified at trial that, when he spoke with Petitioner, Petitioner admitted that he knew Bailey and that he had seen cocaine in the bungalow in Jamaica, though Petitioner stated that it was Green's cocaine and that he had no connection to it.  (Id.).  In holding that the admission of these statements did not alter the result of Petitioner's trial, this Court noted that Petitioner's co-

conspirators testified directly to his involvement and participation in the conspiracy, including his helping arrange travel and taping cocaine onto Bailey's legs.  (Id.).  Given the overwhelming evidence of Petitioner's guilt, the Court held that Petitioner had not shown that he was prejudiced by the admission of his statements, as required to establish a constitutional deprivation of the effective assistance of counsel.  (Id.).

4. Over a year after this Court denies his motion to vacate, Petitioner files a Rule 60(b) motion for relief from judgment, and this Court dismisses the motion, construing it as a successive motion to vacate.

Eighteen months after this Court denied his motion to vacate, Petitioner filed a motion for relief from judgment under Rule 60(b).  (Case No. 3:08cv219, Doc. No. 49).  In his motion, Petitioner asserted five claims of error in this Court's order denying his motion to vacate. In particular, Petitioner argued: (1) that this Court incorrectly stated in its order that, in overruling Petitioner's objection to the admission of his statements at trial, the Court had <u>not</u> mentioned the fact that trial counsel had failed to file a pretrial motion seeking the suppression of those statements and that the Government had committed fraud and misrepresentation by stating the same in its response to Petitioner's claims; (2) that this Court mistakenly stated in its order that Petitioner admitted to knowing Bailey, when the record establishes that he denied knowing Bailey and the government used that denial in arguments to the jury; (3) that this Court "made a mistake and committed error" by failing to consider every statement attributed to Petitioner and obtained in violation of the Fifth Amendment in evaluating his argument that trial counsel was ineffective for failing to move, pretrial, to suppress those statements; (4) that this Court mistakenly attributed words of Agent Mensinger to Agent Crum, when noting that Agent Crum testified that Petitioner had stated that he already knew his rights, and that the Court mistakenly

stated that Agent Crum interviewed Petitioner as part of the re-entry process, rather than hours later; and (5) that this Court mistakenly stated in its opinion that Agent Mensinger testified that if Petitioner could not get one, a lawyer would be appointed to represent him and made an error of law in concluding that Petitioner's Miranda rights were not violated because he was informed of some of his rights.

The Court ultimately dismissed Petitioner's Rule 60(b) motion as an unauthorized successive petition. (Case No. 3:08cv219, Doc. No. 52). Concluding that it lacked jurisdiction to adjudicate the merits of Petitioner's motion, the Court dismissed the motion and declined to issue a COA. (Id. at 2-3). Petitioner appealed, and the Fourth Circuit reversed this Court's order dismissing Petitioner's Rule 60(b) motion, holding that this Court erred in dismissing the motion as a successive motion to vacate when Petitioner's first, second, fourth, and fifth claims are properly categorized as Rule 60(b) claims challenging the collateral review process, rather than a successive attack on Petitioner's conviction over which this Court did not have jurisdiction. United States v. McRae, 793 F.3d 392, 400 (4th Cir. 2015). The Fourth Circuit held that this Court should have given Petitioner the opportunity "'to elect between deleting the improper claims or having the entire motion treated as a successive application' for relief." Id. (quoting United States v. Winestock, 340 F.3d 200, 207 (4th Cir. 2003)).

In response to the Government's argument that this Court's order dismissing Petitioner's motion should be affirmed because each of his claims was untimely, the Fourth Circuit acknowledged that Petitioner's Rule 60(b) claims fall into the categories that must be asserted "'no more than a year after the entry of the judgment or order or the date of the proceeding.'" Id. (quoting FED. R. CIV. P. 60(c)(1)). The Fourth Circuit declined to affirm on this basis, however, holding that the issue of timeliness "should be resolved by [this Court] in the first instance." Id.

The Fourth Circuit also declined to affirm this Court's judgment based on the lack of merit of his Rule 60(b) claims, as the Government also argued was appropriate. Id. at 401. The Fourth Circuit stated that the merits of Petitioner's Rule 60(b) claims were "best left to [the district court] on remand." Id.

## II.    STANDARD OF REVIEW

Rule 60(b) provides that a court may relieve a party from a final judgment for specific reasons, including mistake, newly discovered evidence, fraud or misconduct by an opposing party, a void judgment or a judgment that has been satisfied, or "any other reason that justifies relief." FED. R. CIV. P. 60(b); see Winestock, 340 F.3d at 204 (noting that Rule 60(b) "codifies inherent judicial powers that were previously exercised through a gaggle of common-law writs, which the rule abolishes"). Where a party seeks relief from a final judgment based on mistake, newly discovered evidence, or fraud or misconduct by an opposing party, the party must file its motion within a year after the entry of the judgment. FED. R. CIV. P. 60(c).

## III.    DISCUSSION

A.     Petitioner's Rule 60(b) Motion for Relief from Judgment

I. Timeliness of Petitioner's Rule 60(b) motion.

In his first, second, fourth, and fifth claims for relief, Petitioner asserts that this Court made factual mistakes in its adjudication of his motion to vacate—mistakes that warrant reopening the judgment against him—and that the Government committed fraud and misrepresentation.[2] Petitioner's claims based on mistakes of fact made by this Court in

---

[2] As to his third claim for relief Petitioner has conceded, as the Fourth Circuit found, that this claim is properly characterized as a successive, collateral attack on his conviction, and Petitioner has therefore abandoned this claim. See (Doc. No. 73 at 16).

adjudicating his motion to vacate fall within the class of claims permitted under Rule 60(b)(1), and Petitioner's claims that the Government committed fraud or misrepresentation on the Court in its response to Petitioner's motion to vacate fall under Rule 60(b)(3).  See FED. R. CIV. P. 60(b)(1) (providing that a court may relieve a party from a final judgment based on mistake); FED. R. CIV. P. 60(b)(3) (providing that a court may relieve a party from a final judgment based on fraud, misrepresentation, or misconduct by an opposing party).  Under Rule 60(c)(1), a motion under Rule 60(b) for any of these reasons "must be made . . . no more than a year after the entry of the judgment or order."  FED. R. CIV. P. 60(c)(1).  In its decision reversing this Court's order dismissing Petitioner's motion for lack of jurisdiction, the Fourth Circuit recognized that Petitioner's claims are governed by a one-year statute of limitations.  McRae, 793 F.3d at 400.

Each of Petitioner's Rule 60(b) claims are untimely because he waited nearly 18 months after this Court denied his motion to vacate to file his Rule 60(b) motion.  While Petitioner also states in his Rule 60(b) motion that it is brought under subsection (6) of the rule, the Fourth Circuit has made clear that a party may not seek relief under subsection (6) on any basis that is covered in subsections (1) through (5), as Petitioner's claims in this case clearly are.  See Aikens v. Ingram, 652 F.3d 496, 501 (4th Cir. 2011).  Petitioner's Rule 60(b) claims are untimely; therefore, this Court will dismiss them as barred by the one-year statute of limitations.

The Court notes that, in his Reply, filed by counsel on Petitioner's behalf, Petitioner contends that the Government waived any untimeliness defense it may have had to the Rule 60(b) motion.  In support, Petitioner contends that the Government did not raise the timeliness defense until three and a half years after Petitioner first filed his Rule 60(b) motion.  Petitioner states that "the Government . . . would have been well aware of a potential Rule 60(b)(1) defense

15

when [Petitioner] filed his Rule 60(b) motion on September 7, 2012.  Despite the alleged simplicity of its timeliness argument, the Government chose not to respond to [Petitioner's] motion, which sat on this Court's docket unopposed for almost eight months before being dismissed on jurisdictional (not timeliness grounds)."  (Doc. No. 73 at 15).

Petitioner's argument fails.  Here, the Court, without first requiring any briefing from the Government, dismissed, sua sponte, the Rule 60(b) motion as successive.  Thus, contrary to Petitioner's contention, the Government was not dilatory in failing to raise the timeliness issue before it did.  Indeed, this Court's dismissal of the Rule 60(b) motion as successive was also a finding that this Court did not have jurisdiction over the Rule 60(b) motion.  The Government did not have the opportunity to submit any filings raising the timeliness of the motion until Petitioner appealed the Court's dismissal of the Rule 60(b) motion to the Fourth Circuit.

II. Merits of Petitioner's Rule 60(b) Motion.

This court finds, alternatively, that even if Petitioner's Rule 60(b) motion were timely, Petitioner has not shown extraordinary circumstances warranting relief under Rule 60(b).  As the Supreme Court recognized in Gonzalez, "Rule 60(b) has an unquestionably valid role to play in habeas cases" and may be used, for example, to relieve parties from the effect of a mistakenly entered default judgment or to obtain vacatur of a judgment that is void for lack of subject-matter jurisdiction.  Gonzalez v. Crosby, 545 U.S. 524, 534 (2005).  A party seeking relief under Rule 60(b) must show "extraordinary circumstances" justifying the reopening of a final judgment, however, and "[s]uch circumstances will rarely occur in the habeas context."  Id. at 535. Addressing subsection (6) of Rule 60(b), which provides that a court may relieve a party from a final judgment for "any other reason that justifies relief," the Supreme Court has stated that a court should "consider the risk of injustice to the parties in the particular case, the risk that the

16

denial of relief will produce injustice in other cases, and the risk of undermining the public's confidence in the judicial process." Liljeberg v. Health Servs. Acquisition Corp., 486 U.S. 847, 864 (1988). A party may not seek relief under Rule 60(b)(6) on any basis that is covered in subsections (1) through (5) of Rule 60(b), and relief may not be granted, unless the party filing the motion has a meritorious claim or defense, the opposing party will not be unfairly prejudiced by having the judgment set aside, and the reason for seeking relief could not have been addressed on appeal from the judgment. Aikens, 652 F.3d at 501 (emphasizing that a "very strict interpretation of Rule 60(b) is essential if the finality of judgments is to be preserved").

Here, even if Petitioner's claims timely, they do not present extraordinary circumstances justifying Rule 60(b) relief under the facts of this case. Petitioner's first claim related to the reason this Court overruled his objection to the admission of the statements he made to Agents Crum and Mensinger. Petitioner correctly argues the Government mistakenly asserted in its supplemental response to Petitioner's motion to vacate that this Court had not mentioned at trial Petitioner's failure to file a pretrial motion to suppress in overruling his objection. This Court made the same mistaken assertion in its order denying Petitioner's motion to vacate. The record is clear, however, that while the Court did mention Petitioner's failure to file a motion to suppress and, in fact, ruled that Petitioner had waived his right to challenge the admission of the statements, the Court also made an independent and alternative ruling that, even if Petitioner had not waived his right to seek the suppression of the statements, the Court would still admit the statements because they were not obtained in violation of Petitioner's constitutional rights. More specifically, the Court's Order denying Petitioner's motion to vacate stated the following:

> Petitioner contends that his trial counsel was ineffective for failing to move to suppress his statements as having been made without having been advised of his Miranda rights. Petitioner argues that his counsel sought to have

his statements excluded at trial but did not succeed because the Court determined that Petitioner had waived his rights to challenge the admissibility of the statements by failing to file a motion to suppress. This is incorrect. The record establishes that during trial, counsel challenged the admissibility of Petitioner's statements claiming that Petitioner "never made [the] statements at all." (Id. at 104). Government counsel noted that Petitioner had not filed a motion to suppress the statements; however, in denying counsel's motion to exclude, the Court made no mention of the absence of a pre-trial motion to suppress. (Id.)

       With respect to whether there was a sound basis for challenging the admissibility of the statements purportedly made without Miranda warnings, Agent Crum testified that the Petitioner's statements were made to him during an interview with Petitioner upon his return to the United States from Jamaica and during the customs re-entry process. Prior to his interview with Agent Crum, Petitioner insisted that he was aware of his rights. (Id. at 549). Agent Mensinger explained to Petitioner that he did not have to answer any questions, that a lawyer would be appointed to represent him if he could not retain one, and that he should not answer any questions if he could not answer them truthfully. (Id. at 549, 554). This is not a formal explanation of his rights pursuant to Miranda, but Petitioner was at least informed of some of his rights consistent with Miranda warnings. But even if Petitioner was not informed of his Miranda rights, and his counsel was ineffective for failing to file a motion to suppress his statements made in violation of Miranda, Petitioner has not established that he was prejudiced by the admission of these statements at trial. Petitioner admitted that he knew Ms. Bailey and that he had seen cocaine in the bungalow in Jamaica, but he denied any connection with the cocaine smuggling, stating that it was Mr. Green's endeavor, and that he had done nothing wrong. (Id. at 550-53). However, Petitioner's co-conspirators testified directly to his involvement and participation in the conspiracy, from helping to arrange the travel to taping the cocaine onto Ms. Bailey's legs before her departure from Jamaica. (Id. at 159-164; 170-175). As stated by the Fourth Circuit, there was overwhelming evidence of Petitioner's guilt. McRae, 235 Fed. App'x at 970. Petitioner has thus not established that he was prejudiced by the admission of his statements, and so his claim must fail.

(Doc. No. 39 at 8-9) (footnote omitted). Here, as the language of the denial of the motion to vacate makes clear, while the Government and this Court mistakenly asserted that the Court had not mentioned, at trial, Petitioner's failure to move to suppress the statements, that mistake does not constitute an extraordinary circumstance warranting Rule 60(b) relief because the Court's mistake of this factual assertion was not dispositive of the Court's denial of the motion to vacate.

       With respect to Petitioner's claim that this Court mistakenly stated in its order that

Petitioner had admitted to knowing Bailey, the trial transcript establishes that Agent Mensinger testified that Petitioner did, at one point, acknowledge that he had known Bailey and that he was in Jamaica with her, even while he denied any involvement in the cocaine importation.  See (Crim. Case No. 3:04-cr-223-RJC-DCK-2, Trial Tr. at 551-53 (testifying that although Petitioner initially claimed he did not know Bailey, "later he recanted the story and stated that I believe Ms. Bailey was with him in Jamaica.  And he referred to the three girls took a cab to the airport in Jamaica, I believe Montego Bay, and himself and Mr. Green took a separate vehicle or cab to the airport.").  This Court's statement, therefore, was accurate, as was its conclusion that, even if that statement had been obtained in violation of Miranda, the evidence of Petitioner's guilt was overwhelming apart from those statements or any other statements made to the agents that were admitted at trial.  This claim, therefore, fails on its merits.

Next, Petitioner claims that this Court mistakenly attributed to Agent Crum the testimony that Petitioner stated that he already knew his rights.  Although the trial transcript does not provide a precise timeline as to when Petitioner was interviewed by whom, it does not appear that the Court's statement that Petitioner asserted that he knew his rights before he ever spoke to Agent Crum is accurate, because Agent Crum interviewed Petitioner during the secondary examination before Agent Mensinger spoke with Petitioner, and Petitioner told Agent Mensinger, not Agent Crum, that he was aware of his rights.  However, the secondary examination was conducted as part of the customs re-entry process, as found by this Court, and Petitioner has not identified any statement to which Agent Crum testified that was obtained in violation of Miranda.  Additionally, as this Court noted, the evidence against Petitioner was presented primarily through the testimony of his co-conspirators.  None of the statements made to Agents Crum or Mensinger led to evidence that the Government would not have otherwise

obtained, and those statements were a relatively minor part of the Government's overwhelming

case against Petitioner. In sum, this Court's misattribution of a single statement in its order

denying Petitioner's motion to vacate is inconsequential and cannot support relief under Rule

60(b).

Finally, Petitioner asserts that this Court mistakenly stated in its order denying his motion

to vacate that Agent Mensinger testified that if Petitioner could not get a lawyer, one would be

appointed to represent him. The trial transcript shows, in fact, that the Court made no such

mistake. That is, when Agent Mensinger was asked during Petitioner's trial whether he told

Petitioner "that an attorney would be given to him if he want[ed] one," Agent Mensinger replied,

"Yes." (Crim. Case No. 3:04-cr-223-RJC-DCK-2, Trial Tr. at 549). Thus, the Court's statement

was accurate in light of the trial testimony, and this claim, too, fails on its merits.

Taken together, while Petitioner has identified two factual mistakes in this Court's order

denying his motion to vacate, Petitioner has not presented any claim that would warrant the

extraordinary relief of reopening the criminal judgment in his case. Additionally, each of the

mistakes Petitioner identifies in his Rule 60(b) claims could have been asserted and addressed on

direct appeal from this Court's judgment denying his motion to vacate. Aikens, 652 F.3d at 501.

The Government presented overwhelming evidence of Petitioner's guilt, and the mistakes

Petitioner identifies in the adjudication of his motion to vacate simply do not satisfy the standard

required to justify the reopening of this Court's judgment.

In sum, because Petitioner's Rule 60(b) claims (Claims 1, 2, 4, and 5) were untimely filed

and because, in any event, they do not warrant the reopening of this Court's judgment denying

his motion to vacate, those claims are dismissed as untimely, and alternatively, on the merits.[3] To the extent that Petitioner seeks an evidentiary hearing in his Reply, the request is denied.

**B.     Petitioner's Remaining Pro Se Motions for Relief (Doc. Nos. 56; 57; 58; 67)**

Petitioner filed several pro se motions for relief before counsel was retained to represent him.  Each of these motions seeks to either sanction the Government or for an order recusing the undersigned.  For the following reasons, the Court will deny Petitioner's pro se motions.

First, in support of his motion for sanctions brought under FED. R. CIV. P. 11(b), Petitioner contends that the Government should be sanctioned for submitting "material false statements to the court."  Specifically, Petitioner seeks sanctions against Assistant U.S. Attorney Amy Ray and former U.S. Attorney Anne Tompkins, accusing them of misrepresenting material facts before the Court.  Petitioner also seeks sanctions against Assistant U.S. Attorney Karen Marston, accusing her of engaging in "selective prosecution based on race."  Similarly, in his motion seeking a "Hazel-Atlas Bill of Review," Petitioner contends that the Government and this Court have engaged in fraud by misrepresenting the facts that led to the underlying denial of Petitioner's motion to vacate.

First, Rule 11(c) of the Federal Rules of Civil Procedure provides for sanctions where counsel violates the duties set forth in Rule 11(b), which states that, by presenting a pleading, an attorney represents to the Court that the allegations and other factual contentions within the pleading have evidentiary support.  FED. R. CIV. P. 11(b).  As to Petitioner's motion for a "Hazel-Atlas Bill of Review," in Hazel-Atlas Glass Co. v. Hartford-Empire Co., the Supreme Court held that "under certain circumstances, one of which is after-discovered fraud," a court may exercise

---

[3]  As noted, supra, Petitioner has elected to abandon the third claim in his Rule 60(b) motion.

its equitable powers to vacate judgments "to fulfill a universally recognized need for correcting injustices which, in certain instances, are deemed sufficiently gross to demand a departure from rigid adherence" to the finality of judgments. 322 U.S. 238, 244 (1944), overruled on other grounds by Standard Oil Co. v. United States, 429 U.S. 17 (1976). In Hazel-Atlas, the Supreme Court exercised this power with respect to a "deliberately planned and carefully executed scheme to defraud" a federal court of appeals. Id. at 245.

Petitioner's motions for Rule 11 sanctions and for a "Hazel-Atlas Bill of Review" are both denied, as Petitioner has not shown that any of the Government participants or the Court itself engaged in any conduct warranting Rule 11 sanctions or a "Hazel-Atlas Bill of Review." As the Court has already addressed at length, any mistakes in the representation of facts in the underlying motion to vacate were inadvertent and were, in any event, not dispositive of the outcome. Here, again, the evidence against Petitioner in supporting his conviction was simply overwhelming. Furthermore, Petitioner has simply not shown that the Government engaged in selective prosecution based on race.

Finally, in two separate pro se motions, (Doc. Nos. 58; 67), Plaintiff seeks recusal of the undersigned, in which Petitioner contends that the undersigned should recuse himself from adjudicating Petitioner's Hazel-Atlas motion and Petitioner's Rule 60 motion. In support of the motion to recuse, Petitioner contends, among other things, that the undersigned "made fraudulent misrepresentations while deciding Petitioner's 2255 motion." (Doc. No. 58 at 1). Title 28 U.S.C. § 455(a) requires that a judge "shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." Disqualification is required if a reasonable factual basis exists for doubting the judge's impartiality. Rice v. McKenzie, 581 F.2d 1114, 1116 (4th Cir. 1978). The Court will deny the motion to recuse. Petitioner has not asserted sufficient facts

setting forth grounds for disqualification of the undersigned under 28 U.S.C. § 455. As the Court

has explained at length, the factual errors made in the underlying motion to vacate were

inadvertent. Factual or legal errors made by the Court, without more, "do not create the

appearance of partiality" for purposes of a motion to recuse brought under 28 U.S.C. § 455(a).

Spangler v. Sears, Roebuck & Co., 759 F. Supp. 1327, 1332 (S.D. Ind. 1991). Furthermore,

although Petitioner has expressed dissatisfaction with this Court's rulings, he has not presented a

reasonable factual basis for doubting the undersigned's partiality. Petitioner's motions for

recusal are denied.

## IV. CONCLUSION

In sum, for the reasons stated, Petitioner's motion for relief from judgment is denied.

Furthermore, Petitioner's remaining pro se motions for relief are all denied.

**IT IS, THEREFORE, ORDERED** that

1.	On remand from the Fourth Circuit Court of Appeals, Petitioner's Motion for

	Relief from Judgment, (Doc. No. 49), is **DENIED**;

2.	Petitioner's pro se (1) Motion for Sanctions Pursuant to FED. R. CIV. P. 11(b),

	(Doc. No. 56); (2) Motion for Hazel-Atlas Bill of Review, (Doc. No. 57); (3)

	Motion for Recusal, (Doc. No. 58); and (4) Motion for Disqualification/Recusal,

	(Doc. No. 67) are **DENIED**.

3.	The Clerk is instructed to terminate this action.

4.	**IT IS FURTHER ORDERED** that pursuant to Rule 11(a) of the Rules

	Governing Section 2254 and Section 2255 Cases, this Court declines to issue a

	certificate of appealability. See 28 U.S.C. § 2253(c)(2); Miller-El v. Cockrell,

	537 U.S. 322, 338 (2003) (in order to satisfy § 2253(c), a petitioner must

demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong); <u>Slack v. McDaniel</u>, 529 U.S. 473, 484 (2000) (when relief is denied on procedural grounds, a petitioner must establish both that the dispositive procedural ruling is debatable and that the petition states a debatable claim of the denial of a constitutional right).

Signed: September 27, 2016

Robert J. Conrad, Jr.
United States District Judge